OPINION HEADING PER CUR 









                NO.
12-06-00373-CV

 

IN THE COURT OF APPEALS

 

TWELFTH COURT OF APPEALS
DISTRICT

 

TYLER, TEXAS

 

 

FRANK O. SEMBERA,        §                      APPEAL
FROM THE 321ST

APPELLANT/CROSS-APPELLEE

 

V.        §                      JUDICIAL DISTRICT COURT OF

 

PETROFAC
TYLER, INC. AND

PETROFAC LIMITED,       §                      SMITH
COUNTY, TEXAS

APPELLEES/CROSS-APPELLANTS

                                                                                                                                                            

OPINION

            Frank O.
Sembera appeals the trial court’s judgment denying him the recovery of stock he
once owned in his former employer, Petrofac Tyler, Inc. (“PT”), and the
recovery of stock from a related company, Petrofac Limited (“PL”).  Instead, the trial court awarded Sembera
$105,269.40 for five thousand shares of stock he owned in PT until December 31,
2001.

            In four
issues, Sembera contends the trial court erred by not restoring his stock in
PT, that the evidence was not legally or factually sufficient to support the
trial court’s judgment, that he could not be forced to sell his shares of stock
when he was terminated, and, in the alternative, that he was entitled to
prejudgment and postjudgment interest on his award.  In one cross issue, PL contends the judgment
in favor of Sembera was erroneously entered against it.  PL also brings three conditional cross issues
relating to its status as a party to the action.

            We affirm
Sembera’s judgment against PT.  We
reverse Sembera’s judgment against PL and render a take nothing judgment in its
place.

 








Factual and
Procedural Background

            On January
1, 2000, Sembera, a senior cost engineer, began purchasing shares in his
employer, PT, a worldwide energy exploration company.  PT had been a Subchapter S corporation since
1986.  By 2001, PT had fifty-one
shareholders who owned a total of 855,000 shares.  Sembera owned 5,000 of these shares.  Each of these shareholders and their spouses
had entered into a stock purchase agreement with PT.  One of the major purposes of this agreement
was to protect the corporation’s 1986 Subchapter S election.  Section 13(a)(ii) of the agreement stated
that “no shareholder shall take any action or inaction which will result in the
termination of the S Corporation election unless all of the other shareholders
and the corporation consents to such action or inaction.”[1]       In January of 2001, PT shareholders were
notified that there was a likelihood of a change in PT’s structure during that
calendar year.  In October, details were
given in a shareholder meeting regarding PT’s plans to sell its assets to a
soon to be created foreign company, PL. 
The current PT shareholders would have the option of becoming owners in
the new company.  The new company’s
purpose was to obtain an equity investor or become a publicly traded company so
that more capital could be generated to fund business operations.  On November 19, another PT shareholder
meeting was held and more than two-thirds of the shareholders voted to sell
substantially all of PT’s assets to the new company.  During that meeting, the following “Notice Of
Shareholder Election” was given to each PT shareholder:

PETROFAC TYLER, INC.

NOTICE OF SHAREHOLDER
ELECTION

 

Shareholder’s
Name ______ (Shareholder)                                                   Date:
November 27, 2001

 

At a shareholder meeting of
Petrofac Tyler, Inc. held on November 19, 2001, more than two-thirds of the
shareholders of Petrofac Tyler, Inc. voted to accept the recommendation of the
Board of Directors to sell substantially all the assets of Petrofac Tyler,
Inc.  As a result of this transaction, I
understand that as a Petrofac Tyler, Inc. shareholder, I can elect to receive
cash and further receive, separate from the cash, stock in a new holding
company to be formed outside the United States in exchange for the sale of the
assets or I can elect to redeem my shares of Petrofac Tyler, Inc. under the
terms of the Stock Purchase Agreement dated March 9, 2000.

 

This constitutes my notice to
Petrofac Tyler, Inc. of my irrevocable election.

 

I hereby irrevocably elect to
(Check only one box) -

 

___         Receive cash and, separate from the
cash, stock in a new holding company formed outside the United States following
the sale of substantially all assets of Petrofac Tyler, Inc. in accordance with
the terms negotiated by the Board of Directors of Petrofac Tyler, Inc.

 

                                Or

 

___         Redeem ________ of Shares . . . of
stock I own in Petrofac Tyler, Inc. at a per share value as of December 31,
2001, according to the formula set forth in Section 4 of the Stock Purchase
Agreement and, based on the remaining shares I own in Petrofac Tyler, Inc.,
receive cash and separate from the cash, stock in a new holding company formed
outside the United States following the sale of substantially all assets of
Petrofac Tyler, Inc. in accordance with the terms negotiated by the Board of
Directors of Petrofac Tyler, Inc.

 

Or

 

___         Redeem all of my shares in Petrofac
Tyler, Inc. at a per share value as of December 31, 2001, according to the
formula set forth in section 4 of the Stock Purchase Agreement.

 

 

                                                                                                _________________________________

                                                                                                Signature

 

                                                                                                _________________________________

                                                                                                Printed
Name

 

 

Shareholders were asked to make an election by November 26,
2001 so that the necessary documentation to effectuate their decision would be
in place by December 31, 2001.  The
purpose of this election was to determine which PT shareholders wanted to
become shareholders in the new company being formed.  By early December, fifty of the fifty-one PT
shareholders had made an election, with Sembera being the lone holdout.

            Correspondence
and meetings between Sembera and Philip Norton, a consultant hired by PT to put
together and implement the transitional plan, occurred throughout December.[2]  On
December 22, Sembera sent the following email to Norton:

 

From:                    Frank Sembera

Sent:                       Saturday, December 22,
2001 4:04 PM

To:                         Philip Norton

Subject: Petrofac Tyler, Inc.
Restructure

 

                Personal and Confidential

                December 22, 2001

                Philip
Norton

                Petrofac

 

                Re:
Petrofac Tyler, Inc. Restructure

                

My attorney advised me that
the actions taken and to be taken by Petrofac contemplate a merger pursuant to
the Texas Business Corporation Act.  He
advised that additional documentation, information and notice were required to
be furnished to me in connection with the proposed merger.  He also advised that Petrofac did not provide
requisite information for the proposed merger or sale of assets.

 

Since I have not been given
proper opportunity to dissent from the proposed merger or sale of assets, I
hereby  formally register my dissent to
the proposed merger and sale of assets and in accordance with the Texas
Business Corporation Act request payment of fair value for my shares.

 

Should you have any
disagreement with this request, please let me know at your earliest
convenience.

 

                Frank
Sembera

 

 

                Based upon Sembera’s email, on December
31, PT included Sembera’s 5,000 PT shares with 40,300 shares of other PT
shareholders who did not want to become a part of the new corporation and sold
these shares to PT’s three largest shareholders, Ralph Martin, Louis Owen, and
Gregory Hendrickson.  The new company,
PL, was formed on January 10, 2002. 
Three days later, PT sold virtually all of its assets to PL in exchange
for shares of PL stock.  These PL shares
were then distributed to the shareholders on PT’s books as of January 1,
2002.  Following notification by PT of
the completion of the asset sale to PL, Sembera sent Norton and Hendrickson the
following email on February 8, 2002:

 

                From:                    Frank Sembera

                Sent:                       Friday, February 8, 2002 4:41 PM

                To:                         Philip Norton

                Cc:                          Greg Hendrickson

                Subject: Petrofac Tyler, Inc. Stock 2/8/02

 

                Personal
and Confidential

 

                Phil,

 

Petrofac advised shareholders
and employees on January 30, 2002 that actions submitted for shareholder
approval at the November 19, 2001 special meeting of Petrofac Tyler, Inc.
shareholders had been effected. 
Therefore, in accordance with the Texas Business Corporation Act and my
previous dissent(s), I submit this demand for payment of fair value for my
5,000 shares of Petrofac Tyler, Inc. stock.

 

The estimated fair value per
share of Petrofac Tyler, Inc. stock on November 18, 2001 is $504.02 per
share.  This value is based on: 1.) market
valuations of comparable publicly traded companies, 2.) adjustments for
earnings and cash flow multiples to growth rates and 3.) Petrofac evaluations
and projections.

 

You previously recommended
that the most efficient way to resolve this was to have our attorneys
communicate.  I provided my attorney’s
phone number on January 8.  Since then, I
believe there have been two phone discussions between the attorneys.  I understand that they have had difficulty in
contacting one another.

 

Please let me know if you
have any questions or if you would like to discuss.

 

Frank Sembera

 

 

                On February 19, 2002, PT responded to
Sembera’s email with the following letter:

 

February
19, 2002

 

                Via
hand delivery

                Return
Receipt Requested

 

                Mr.
Frank Sembera

                [address]

                Re:          Your February 8, 2002 demand for fair value of shares in
Petrofac Tyler, Inc.

 

                Dear
Frank:

 

Please accept this letter as
a formal response and notice to your recent communications concerning the fair
value of shares in Petrofac Tyler, Inc. 
First, you are not entitled to any rights under article 5.12 of the
Texas Business Corporation Act because you failed to comply with the
requirements of 5.12.  Second, your
demand for payment of $504.02 per share for 5,000 shares is absurd and,
therefore, rejected.

 

Without waiving Petrofac
Tyler, Inc.’s right to contest and challenge your rights under article 5.12,
Petrofac Tyler, Inc. estimates that the fair value, as of November 18, 2001, of
the 5,000 shares you owned is $54.00 per share, as documented under the Petrofac
Tyler, Inc. Stock Purchase Agreement. 
Petrofac Tyler, Inc. agrees to pay this amount to you, less the amount
you owe to Petrofac Tyler, Inc., within ninety (90) days of January 13, 2002.

 

 

                Petrofac
Tyler, Inc.

 

 

                By:
_________________________________

                                Gregory
L. Hendrickson, Secretary

 

 

            When the
parties failed to reach an agreement on the amount Sembera was to be paid for
his 5,000 shares of PT stock, Sembera filed suit against PT and PL.  During a bench trial in early 2006, Sembera
sought restoration of his PT stock and also inclusion in the distribution of
shares of PL stock.  The trial court
entered a judgment denying Sembera this relief but awarding him $105,269.40 as
the value of his PT shares under the stock purchase agreement.  The trial court then entered findings of fact
and conclusions of law in support of its judgment.  Sembera appeals the trial court’s judgment.

 

Restoration of
Stock

            In his
first issue, Sembera contends that his status as a shareholder was
automatically restored because of the trial court’s determination that he was
not entitled to relief under Texas Business Corporation Act’s dissenting
shareholder provision.  Therefore, he
argues, he was entitled to receive the PL shares distributed in return for his
5,000 shares of PT stock and all dividends paid while his dissent was
pending.  The specific portion of the act
upon which Sembera relies states that

 

if after the hearing of a
petition filed pursuant to Article 5.12 or 5.16, the court shall determine that
such shareholder is not entitled to the relief provided by those articles,
then, in any such case, such shareholder and all persons claiming under him
shall be conclusively presumed to have approved and ratified the corporate
action from which he dissented and shall be bound thereby, the right of such
shareholder to be paid the fair value of his shares shall cease, and his status
as a shareholder shall be restored without prejudice to any corporate
proceedings which may have been taken during the interim, and such shareholder
shall be entitled to receive any dividends or other distributions made to
shareholders in the interim.

 

 

Tex. Bus. Corp. Act Ann. art. 5.13, § C
(Vernon 2003).  

            This issue
is a direct attack upon two of the trial court’s conclusions of law, which
state as follows:

 

10.          Plaintiff cannot be restored as a
shareholder of Petrofac Tyler, Inc. because restoration would prejudice the
actions of Petrofac Tyler, Inc.

 

11.          Petrofac Limited cannot be compelled
to issue shares to Plaintiff or his spouse because to do so would prejudice the
actions of Petrofac Limited.

 

 

These conclusions of law, which are supported by implicit
underlying findings of fact, are also supported by one explicit finding of
fact:

 

                24.          The corporate proceedings of Petrofac Tyler, Inc. would be
prejudiced if Plaintiff was restored to his 5,000 shares in Petrofac Tyler,
Inc.

 

 

Sembera argues that this finding of fact and  the two conclusions of law are not supported
by legally and factually sufficient evidence.

Statutory
Interpretation and Standards of Review

            In our
analysis, we must consider the applicable methodology of statutory
interpretation and the three applicable standards of review.

            Statutory
Interpretation

            The interpretation
of a statute is a question of law.  In re Canales, 52 S.W.3d 698, 701
(Tex. 2001) (orig. proceeding). 
Therefore, we review a trial court’s interpretation of a statute de
novo. Canal Ins. Co. v.
Hopkins,
238 S.W.3d 549, 561 (Tex. App.–Tyler 2007, pet. denied) (citing Smith v. Smith, 22 S.W.3d 140, 149
(Tex. App.–Houston [14th Dist.] 2000, no pet.)).  When performing a de novo review, we exercise
our own judgment and redetermine each legal issue.  Quick
v. City of Austin, 7 S.W.3d 109, 116 (Tex. 1999). We will uphold conclusions
of law on appeal if the judgment can be sustained on any legal theory the
evidence supports.  Canal, 238 S.W.3d at 561 (citing Waggoner v. Morrow, 932 S.W.2d 627, 631
(Tex. App.–Houston [14th Dist.] 1996, no writ)).

            The Texas
Code Construction Act governs the interpretation of statutory codes enacted by
the 60th or a subsequent legislature as part of the state’s continuing
statutory revision program. See Tex.
Gov’t Code Ann. § 311.002 (Vernon 2005). 
Chapter 312 of the Texas Government Code governs the interpretation of
civil statutes enacted by Texas legislatures prior to the 60th legislature. See
Tex. Gov’t Code Ann. §§
312.001-.016 (Vernon 2005).  The Texas
Business Corporation Act was enacted by the 54th legislature and has not been
officially incorporated into the Texas system of subject matter codes.  Instead, the act remains part of the
collection of revised civil statutes and continues to be titled as an “act” and
not a “code.” Tex. Bus. Corp. Act Ann. art.
1.01, § A (Vernon 2003).  Therefore, we
should apply the methods of interpretation set forth in Government Code chapter
312 when interpreting the Business Corporation Act.[3] See Tex. Gov’t
Code Ann. §§ 312.001-.016.

            Under
chapter 312, “[i]n interpreting a statute, a court shall diligently attempt to
ascertain legislative intent and shall consider at all times the old
law, the evil, and the remedy.” Tex. Gov’t
Code Ann. § 312.005 (emphasis added). But see Sheppard v. Lone Star Gas Co., 195 S.W.2d 1013,
1016 (Tex. App.–Austin 1946, writ ref’d) (stating that legislative intent is to
be arrived at, if possible, from the language of the statute itself).  Chapter 312 further provides as follows:

 








                (a)
The Revised Statutes are the law of this state and shall be liberally
construed to achieve their purpose and to promote justice.

 

                (b)
The common law rule requiring strict construction of statutes in derogation of
the common law does not apply to the Revised Statutes.

 








 

Tex.
Gov’t Code Ann. § 312.006 (emphasis added). 
Chapter 312 instructs that “words shall be given their ordinary meaning.”
Tex. Gov’t Code Ann. §
312.002(a).  However, “[i]f a word is
connected with and used with reference to a particular trade or subject matter
or is used as a word of art, the word shall have the meaning given by experts
in the particular trade, subject matter, or art.” Tex. Gov’t Code Ann. § 312.002(b).  

            Under chapter 312, “[a] grammatical
error does not vitiate a law.  If the
sentence or clause is meaningless because of the grammatical error, words and
clauses may be transposed to give the law meaning.”  Tex. Gov’t Code Ann. §
312.012(a).  Likewise, the “[p]unctuation
of a law does not control or affect legislative intent in enacting the law.”  Tex.
Gov’t Code Ann. § 312.012(b). 
Finally, Texas has a well developed body of common law that provides
tools for statutory interpretation and 
predates both chapter 312 and the Code Construction Act.[4]  Under the common
law, statutes should be read as a whole and construed to give meaning and purpose
to every part. Ex parte
Pruitt, 551 S.W.2d 706, 709 (Tex. 1977) (orig.
proceeding). 

            Evidentiary Sufficiency

            Article 5.13, section C of the
Business Corporation Act provides a dissenting shareholder a right to
restoration “without prejudice to any corporate proceedings which may have been
taken during the interim.”  Tex. Bus. Corp. Act Ann. art. 5.13, §
C.  As such, the issue of prejudice,
where applicable, may be raised as a defense to a dissenting shareholder’s
restoration.  Cf. Canal, 238 S.W.3d at 556 (construing a statute
negating liability for consensually incurred towing fees as a defense to towing
fee recovery actions brought against a third party insurance company); Brown & Root, Inc. v. Shelton, No. 12-01-00259-CV,
2003 WL 21771917, at *2 (Tex. App.–Tyler July 31, 2003, no pet.) (not
yet released for publication) (construing a statute of repose as a defense to a
personal injury action based on strict liability or negligence).  Here, the existence of prejudice was a
question of fact.  See Pepe Int’l Dev. Co. v. Pub Brewing Co., 915 S.W.2d 925,
931-32 (Tex. App.–Houston [1st Dist.] 1996, no writ) (treating the existence of
prejudice as a question of fact).  A
trial court’s findings of fact are reviewable for legal and factual sufficiency
of the evidence by the same standards that are applied in reviewing evidence
supporting a jury’s verdict.  Catalina v. Blasdel, 881 S.W.2d 295, 297
(Tex. 1994).

            When reviewing a finding of fact for
legal sufficiency, we may set aside the finding only if the evidence at trial
would not enable a reasonable and fair minded finder of fact to make the
finding under review.  Canal, 238 S.W.3d at 557 (citing City of Keller v. Wilson, 168 S.W.3d 802, 827
(Tex. 2005)).  In making this
determination, we must credit favorable evidence if a reasonable finder of fact
could, and disregard contrary evidence unless a reasonable finder of fact could
not.  Id.  The finder of fact
is the sole judge of the credibility of the witnesses and the weight to be
assigned to their testimony.  Canal, 238 S.W.3d at 557 (citing City of Keller, 168 S.W.3d at
819).  The finder of fact is free to
believe one witness and disbelieve another, and reviewing courts may not impose
their own opinions to the contrary.  Id.  Accordingly,
reviewing courts must assume that the finder of fact decided all credibility
questions in favor of the verdict if a reasonable person could do so.  Id.  If a reasonable
finder of fact could have done so, we must assume that the finder of fact chose
what testimony to disregard in a way that was in favor of  the verdict.  Canal, 238 S.W.3d at 557 (citing City of Keller, 168 S.W.3d at
820).  A finder of fact “may disregard
even uncontradicted and unimpeached testimony from disinterested witnesses”
where reasonable.  Canal, 238 S.W.3d at 557 (citing City of Keller, 168 S.W.3d at
819-20).

            In addition, it is within the finder
of fact’s province to resolve conflicts in the evidence. Canal, 238 S.W.3d at 557 (citing City of Keller, 168 S.W.3d at
820).  Consequently, we must assume that,
where reasonable, the finder of fact resolved all conflicts in the evidence in
a manner consistent with the verdict.  Id. 
Where a reasonable finder of fact could resolve conflicting evidence
either way, we must presume the finder of fact did so in favor of the
verdict.  Canal, 238 S.W.3d at 557 (citing City of Keller, 168 S.W.3d at
821).  Where conflicting inferences can
be drawn from the evidence, it is within the province of the finder of fact to
choose which inference to draw, so long as more than one inference can
reasonably be drawn.  Id. 
Therefore, we must assume the finder of fact made all inferences in
favor of the verdict if a reasonable person could do so.  Id.

 

            Regarding factual sufficiency
challenges, where a party who did not have the burden of proof on an issue
asserts that the trial court’s finding of fact is contrary to the evidence, we
must overrule the complaint unless, considering all the evidence, the finding
is clearly wrong and manifestly unjust. Santa Fe Petroleum, L.L.C. v. Star Canyon Corp., 156 S.W.3d 630, 637
(Tex. App.–Tyler 2004, no pet.) (citing Garza v. Alviar, 395 S.W.2d 821, 823, (Tex. 1965)).  In conducting our review, we must consider,
weigh, and compare all of the evidence that supports and that which is contrary
to the finding.  See Sosa v. City of Balch Springs, 772 S.W.2d 71, 72
(Tex. 1989).  “Reversal [can] occur
because the finding [is] based on weak or insufficient evidence or because the
proponent’s proof, although adequate if taken alone, is overwhelmed by the
opponent’s contrary proof.”  Santa Fe Petroleum, 156 S.W.3d at 637.

            When reviewing factual sufficiency
issues arising from a bench trial, we must remember that the trial court, as
the trier of fact, is the sole judge of the credibility of the witnesses.  Canal, 238 S.W.3d at 557
(citing Santa Fe
Petroleum, 156 S.W.3d at 638).  The trial
court may take into consideration all of the facts and surrounding
circumstances in connection with the testimony of each witness and accept or
reject all or any part of that testimony. 
Canal, 238 S.W.3d at 557-58
(citing Santa Fe
Petroleum, 156 S.W.3d at 638).  Where
enough evidence is before the trial court so that reasonable minds could differ
on the meaning of the evidence, or the inferences and conclusions to be drawn
from the evidence, we may not substitute our judgment for that of the trial
court.  Canal, 238 S.W.3d at 558 (citing Santa Fe Petroleum, 156 S.W.3d at 638).

Discussion

            Before the 1955 enactment of the
Business Corporation Act, there was no statutory authorization for dissent by
shareholders and, as a general rule, dissenting shareholders had no legal right
to recover compensation for their shares of stock.  See Tex.
Bus. Corp. Act Ann. art. 5.11, Comment of Bar Committee – 1955.  In 1967, the legislature amended article
5.13, section C, explicitly setting forth a right of restoration.[5]  See Act of
June 17, 1967, 60th Leg., R.S., ch. 657, 1967 Tex. Gen. Laws 1723-24.  In its current form, the statute plainly
states that a dissenting shareholder may have his status as a shareholder
restored “without prejudice to any corporate proceedings which may have been
taken during the interim.”  Tex. Bus. Corp. Act Ann. art. 5.13, §
C.  The 1967 comment to that article
states:








 

 

                The new Section C makes it clear that the position of
the dissenting shareholder after demand for payment is not rigid. . . . 

 

                [Where appropriate, a shareholder may seek
restoration] except that he has no right to prejudice any corporate proceedings
which may have been taken in the interim.

 

 








Tex.
Bus. Corp. Act Ann. art. 5.13, Comment of Bar Committee – 1967. 

            As
we stated earlier, chapter 312 mandates that “[i]n interpreting a statute, a
court shall diligently attempt to ascertain legislative intent and shall
consider at all times the old law, the evil, and the remedy.”  Tex.
Gov’t Code Ann. § 312.005 (emphasis added).  Here, the “old law” is the 1955 Business
Corporation Act, which did not explicitly contain a right of restoration.  See Act of April 15, 1955, 54th Leg.,
R.S., ch. 64, 1955 Tex. Gen. Laws 282 (the 1955 version of section 5.13).  The “evil” is both the 1955 Business
Corporation Act, because it did not explicitly provide such a right, and the
common law at the time, which was considered by the legislature to include a “rigid”
interpretation of that act. See Tex. Bus. Corp. Act Ann. art. 5.13,
Comment of Bar Committee – 1967.  Thus,
the “remedy” is the amended version of article 5.13, section C, which
explicitly contains a right of restoration. 


            However, the plain language of a
statute is often the best indicator of legislative intent.  See, e.g., Canal, 238 S.W.3d at 563 (“This question is
better answered by unambiguous statutory language rather than legislative
history.”).  The plain language of
article 5.13, section C indicates that it was the intent of the legislature to
impose as a condition precedent to a shareholder’s restoration that the
restoration not prejudice any corporate proceedings that have been taken in the
interim.  See Tex. Bus. Corp. Act Ann. art. 5.13, §
C.  Further, considering legislative
history, and specifically the old law, the evil, and the remedy, it is still
clear that the legislature intended such a condition precedent.  See Tex.
Bus. Corp. Act Ann. art. 5.13, Comment of Bar Committee – 1967; see
also Tex. Bus. Corp. Act Ann.
art. 5.11, Comment of Bar Committee – 1955; Act of April 15, 1955, 54th Leg.,
R.S., ch. 64, 1955 Tex. Gen. Laws 282; Act of June 17, 1967, 60th Leg., R.S.,
ch. 657, 1967 Tex. Gen. Laws 1723-24.  We
must now determine the meaning of the term “corporate proceedings.”

            Corporate Proceedings

            “Proceeding” has been defined to
include “[a]n act or step that is part of a larger action” or “[a] course of
action.”  Black’s Law Dictionary 1221 (7th ed.
1999); American Heritage College
Dictionary 1090 (3d ed. 2000). 
The definition of “proceeding” does not appear to have meaningfully
evolved or changed during the time pertinent to our analysis.  See Webster’s
New World Dictionary (Modern Desk Edition 1979) (defining “proceeding”
to include a “course of action”); American
Heritage Dictionary 1043 (New College Edition 1978) (defining “proceeding”
to include a “course of action” or “procedure”); Webster’s Collegiate Dictionary 790 (5th ed. 1943) (“proceeding”
includes a “procedure,” a “transaction,” and an “act, measure or step in a
course of business or conduct”); Webster’s
Elementary-School Dictionary 451 (1914) (“proceeding” includes “an act
of one who proceeds,” “ a measure or step in a course of business,” and a “transaction”);
Webster’s Common School Dictionary 275
(1892) (“proceeding” is a noun meaning “transaction; course; conduct”); Johnson & Walker’s Dictionary of the
English Language 570 (2d ed. 1828) (defining proceeding as
including to “process from one thing to another,” a “series of conduct,” and a “transaction”).  The word “proceeding,” therefore, is a
broadly defined term.  However, Sembera
contends that “proceedings” should be construed narrowly, encompassing only a
corporate resolution approved at a meeting where a formal vote was taken and
recorded in the corporate books and records.  

            In support of his argument, Sembera
cites other Texas statutes – article 9.10 of the Texas Business Corporation Act
and articles 581-7, 1396-6.06, and 1396-9.10 of the Texas Revised Civil
Statutes –  that refer to “proceedings.”  See
Tex. Bus. Corp. Act Ann. art. 9.10 (Vernon Supp. 2007); Tex. Rev. Civ. Stat. Ann. art. 581-7
(Vernon Supp. 2007); Tex. Rev. Civ.
Stat. Ann. art. 1396-6.06 (Vernon 2003); Tex. Rev. Civ. Stat. Ann. art. 1396-9.10 (Vernon 2003).  In three of these articles, the term “proceedings”
refers to the records of an official body.  See Tex.
Bus. Corp. Act Ann. art. 9.10; Tex.
Rev. Civ. Stat. Ann. arts. 581-7, 1396-9.10.  One article, article 1396-6.06, uses the term
“proceedings” in a more expansive way. 
Still, none of these articles indicate that the legislature intended to
deviate from the “ordinary meaning” of the word “proceeding” when using it in
other statutory contexts.  See Tex. Gov’t Code Ann. § 312.002(a) (“[W]ords
shall be given their ordinary meaning.”). 
Likewise, we have discovered nothing in the wording of article 5.13, its
legislative history, other statutes, or the common law that indicates the term “proceedings”
has taken on a special meaning as a term of art.  See Tex.
Gov’t Code Ann. § 312.002(b). 
Further, adding the word “corporate” does not create a new term, but
instead, merely limits “proceedings” to those that involve a corporation’s
action.  In our review, we have located
nothing to support a conclusion that “corporate proceedings” is always a term
of art with special meaning.  Therefore,
the term “corporate proceedings” must be understood in the context in which it
appears.

            Finally, although article 5.13
applies to the facts of this case before us, it will no longer apply after
January 1, 2010.  See Tex. Bus. Orgs. Code Ann. § 402.005(a)
(Vernon Supp. 2007). Following January 1, 2010, section 10.367 of the Texas
Business Organizations Code will apply to cases formerly governed by the
provisions of article 5.13.  See Tex. Bus. Orgs. Code Ann. § 10.367(b)
(Vernon Supp. 2007).  That section reads,
in pertinent part:

 

 

§ 10.367.               Rights of Owners Following
Termination of Right of Dissent

                                

                                . . . .

                                

(b)
On termination of the right of dissent under this section:

 

                                . . . .

 

(2)
the owner’s right to be paid the fair value of the owner’s ownership interests
ceases and the owner’s status as an owner of those ownership interests is
restored without prejudice to any interim proceeding if the owner’s ownership
interests were not canceled, converted, or exchanged as a result of the action
or a subsequent fundamental business transaction; . . . .

 

 

Tex.
Bus. Orgs. Code Ann. § 10.367(b)(2).

            We have found no case interpreting
what “without prejudice to any corporate proceedings which may have been taken
during the interim” means.  However, the
legislature, when it enacted section 10.367(b)(2), specifically stated that the
dissenting shareholder’s stock would be restored “if the owner’s ownership
interests were not cancelled, converted, or exchanged as a result of the action
or a subsequent fundamental business transaction.”  One of the purposes of the legislature in
enacting the Business Organizations Code was to “make the law . . . more
accessible and understandable by . . . restating the law in modern American
English to the greatest extent possible.”  Tex. Bus. Orgs. Code Ann. § 1.001
(Vernon Supp. 2007).  During the process
of enacting the new code, it was eventually understood by the legislature that
the new code did not make any significant changes to prior law.  See Robert W. Hamilton, Texas Practice:
Business Organizations § 2.10 (2d ed.). 
As such, our interpretation of the term “corporate proceedings” is
buttressed by subsequent interpretive legislative history supporting a broad
meaning and applying the ordinary meaning of the two words.

            For the foregoing reasons, we hold
that, when the legislature enacted the current version of article 5.13, it
intended that “corporate proceedings” be defined expansively and in a manner
consistent with the ordinary meaning of those two words.

            Evidentiary Sufficiency

            Having determined that, as used in
article 5.13, “corporate proceedings” is an expansive term, we now must
determine if the trial court’s findings of prejudice to corporate proceedings
were supported by legally and factually sufficient evidence.  The evidence showed that Sembera’s ownership
interest was redeemed by PT in a business transaction on December 31,
2001.  The evidence showed that to try to
reverse this transaction and restore Sembera’s PT shares would create
significant tax consequences for PT shareholders.  Further, evidence was presented that the
shares of stock in PL, the new company, had already been distributed to those
who had completed the written election form and, on that form, elected to
receive PL stock.  To provide Sembera
with PL stock would require PL to create additional shares of stock without
providing any compensation for that stock or would require divesting other
shareholders of their shares of stock. 
Those shareholders were not parties to the lawsuit in question and,
thus, the trial court could not have ordered any such divestiture.

            Together, this was evidence of
prejudice to interim corporate proceedings. 
Although Sembera presented evidence contradicting some of PT’s evidence,
it was within the trial court’s province to resolve conflicts in the evidence. See
City of Keller, 168 S.W.3d at 820; Canal, 238 S.W.3d at 557-58; Santa Fe Petroleum, 156 S.W.3d at 638.  Consequently, we must
assume that, where reasonable, the trial court resolved all conflicts in the
evidence in a manner consistent with its findings of prejudice. See id. 
As such, the evidence was legally sufficient to support the trial court’s
findings because the evidence would have enabled a reasonable and fair minded
finder of fact to make them. See City of Keller, 168 S.W.3d at 827; Canal, 238 S.W.3d at 557. 
Likewise, the evidence was factually sufficient to support the trial
court’s findings of prejudice because, considering all the evidence, the findings
were not clearly wrong or manifestly unjust. See Santa Fe Petroleum, 156 S.W.3d at
637.  We overrule Sembera’s first issue.

 

PT Stock Election

            We next consider Sembera’s third
issue in which he contends there was not legally and factually sufficient
evidence to support the trial court’s findings of fact and conclusions of law
that are contrary to his ownership of shares in both PT and PL.  

Standard of Review

            We have previously explained the
standards of review for legal sufficiency challenges as well as factual
sufficiency challenges raised by a party who did not have the burden of proof
on an issue.  In addition, we must
consider the standard of review applicable to a party attacking the factual
sufficiency of the evidence supporting an adverse finding on which it bore the
burden of proof.  When a party attacks
the factual sufficiency of an adverse finding on an issue for which the party
had the burden of proof, the party must demonstrate on appeal that the adverse
finding is against the great weight and preponderance of the evidence. Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242
(Tex. 2001).  The court of appeals must
consider and weigh all of the evidence, and can set aside a verdict only if the
evidence is so weak or if the finding is so against the great weight and
preponderance of the evidence that it is clearly wrong and unjust. Id.  








            In reviewing such a challenge, an
appellate court should be mindful that the finder of fact “was not convinced by
a preponderance of the evidence.” Herbert
v. Herbert, 754 S.W.2d 141, 144 (Tex. 1988). 
Again, we must remember that the trial court, as the trier of fact, is
the sole judge of the credibility of the witnesses. Canal, 238 S.W.3d at 557 (citing Santa Fe Petroleum, 156 S.W.3d at
638).  The trial court may take into
consideration all of the facts and surrounding circumstances in connection with
the testimony of each witness and accept or reject all or any part of that
testimony.  Canal, 238 S.W.3d at 557-58 (citing Santa Fe Petroleum, 156 S.W.3d at
638).  Where enough evidence is before
the trial court so that reasonable minds could differ on the meaning of the
evidence, or the inferences and conclusions to be drawn from the evidence, we
may not substitute our judgment for that of the trial court. Canal, 238 S.W.3d at 558 (citing Santa Fe Petroleum, 156 S.W.3d at 638).

Discussion

            Sembera challenges the sufficiency
of the evidence to support six findings of fact and five conclusions of law.

            Sembera’s Decision

            The first two findings of fact that
Sembera contends are not supported by legally and factually sufficient evidence
are as follows:

 

 

13.          Pursuant to authority given by the
shareholders to determine the terms and conditions and to protect the
corporation’s status as an S corporation, the directors of Petrofac Tyler, Inc.
required each shareholder to complete a written election form as part of the
sale by Petrofac Tyler, Inc. of substantially all of its assets.

 

                . . . .

 

15.          Plaintiff did not complete an election
form as required by the Petrofac Tyler, Inc. Directors.

 

 

                Hendrickson and Norton
testified that the PT directors had authorized the written election form
provided to each of the PT shareholders. 
Sembera acknowledged he had been provided an election form by PT.  He further testified that he knew he was
under a contractual obligation to assist PT and his fellow shareholders to
retain PT’s Subchapter S election.

            Sembera, utilizing his MBA degree
from the University of Dallas, asked Norton twenty-nine sophisticated questions
concerning financial issues, management structure issues, and the tax
implications of the transaction.  On
November 26, a week after Sembera and the other fifty PT shareholders received
the election form, Norton gave Sembera a seven page single spaced document
responding to each of his twenty-nine questions.  Although the other fifty shareholders had
made an election by early December, Sembera continued to ask Norton for
extensions to make an election.  His
December 3 email to Norton tracked much of the shareholder election form:

 

From:                    Frank Sembera

                Sent:                       Monday, December 03, 2001 2:51 PM

                To:                         Philip Norton

                Cc:                          Mike Coyne

                Subject: CONFIDENTIAL: Shareholder Election – Frank
Sembera

 

                Philip,

 

Thanks
for the information provided on 11/26 and 11/30.  My attorney had reviewed the information regarding
the proposed Petrofac Restructure and Shareholding.  It is his advice that I should receive and
review the New Stock Purchase Agreement prior to executing the irrevocable
Election Form.

 

Therefore,
in accordance with Petrofac’s advice to Shareholders to seek professional
advice prior to execution of the individual Shareholder Election Form and my
attorney’s advice, I must withhold my election until after receipt and review
of the New Stock Purchase Agreement.

 

As a
note, it is currently my intention to elect to “receive cash and, separate from
the cash, stock in a new holding company formed outside the United States
following the sale of substantially all assets of Petrofac Tyler, Inc. in
accordance with the terms negotiated by the Board of Directors of Petrofac
Tyler, Inc.”

 

                Thanks,

                Frank

 

 

 

            Communications continued between
Norton and Sembera.  Norton pressed
Sembera to make an election but Sembera continued delaying his decision.  On December 14, Norton sent Sembera the
following email:

 

                From:                    Philip Norton

                Sent:                       Friday, December 14, 2001 4:57 PM

                To:                         Frank Sembera

                Cc:                          Mike Coyne

                Subject: Your Earlier Messages of December 12

 

                Frank,

 

Regarding
the subject messages, I would recommend for the “Petrofac Tyler, Inc. Capital
Gains” message you request an individual session on December 19th (refer to my
Tyler Shareholder message of today). 
These sessions are available from 1-3 on Wednesday.

 

For
the “Shareholder Election - Frank Sembera” message, as noted in my message to
you of December 5, 2001, your election was conditionally extended to December
7, 2001 based on fulfilling your request and providing additional time to
review the related document.  There has
been no extension thereafter and therefrom we consider your election has been
made.

 

                Regards,

                Phil

 

            After this email, Norton continued
responding to more questions and communications regarding the transaction.  Sembera continued making numerous trips to
the PT data room where documents detailing the transaction were provided for
all shareholders.  Sembera attended a
December 19 shareholder meeting.  On that
day, the PT Board of Directors established an eight day period within which
shareholders who had previously elected not to be part of the new transaction
could change their election.  Finally, on
December 22, Sembera sent the email registering his dissent to the
transaction.  Hendrickson and Norton
testified that this December 22 email was considered by PT to be Sembera’s
election to sell his shares of stock. 
This led to the redemption of his 5,000 shares on December 31, 2001 as
contemplated by the shareholder election form.

            At oral argument, Sembera contended
that the December 22 email could not have been a sale of his shares because of
the following additional conclusion of law entered by the trial court:

 

7.             The December 22, 2001[] email from
Sembera to Phil Norton[] was not a sale of Sembera’s shares in Petrofac Tyler,
Inc.[] because there was no joinder of his spouse.

 

 

                Implicit within this
conclusion of law is a fact finding that, with “joinder of his spouse,” the
email would have constituted an election to sell.  This is even more evident in the context of
the form in which the proposed conclusion of law was submitted.  As originally submitted to the trial court,
the proposed conclusion of law did not include the text “because there was no
joinder of his spouse.”  This text was
added to the proposed finding before the findings and conclusions were
signed.  Therefore, we can discern that
the trial court considered the December 22 email to be “a sale of Sembera’s
shares” but concluded that the sale was ineffective “because there was no
joinder of his spouse.”  The trial court
had the opportunity to make a broader ruling that would have encompassed other
reasons for the email’s ineffectiveness but chose not to, thereby limiting the
reasons for its ineffectiveness to one single reason, “no joinder of [Sembera’s]
spouse.”

            Again, we review conclusions of law
de novo, and an erroneous conclusion of law is not binding on appeal. Canal, 238 S.W.3d at 561.  The 5,000 shares of the stock had been issued
solely in the name of Sembera.  Where
community property is held in one spouse’s name only, there is a presumption
that the property is sole management community property. Tex. Fam. Code Ann. § 3.104(a)
(Vernon 2006).  Absent a showing of fraud
or notice on the part of persons dealing with the named spouse, the sole
management presumption protects third parties who rely on the spouse’s
authority to deal with the property. Tex.
Fam. Code Ann. § 3.104(b) (Vernon 2006); see Jean v. Tyson-Jean, 118 S.W.3d 1, 5
(Tex. App.–Houston [14th Dist.] 2003, pet. denied).  

            Not only were the shares of stock
issued in Sembera’s name, but he alone signed the promissory notes for the
purchase of the shares.  The related
stock certificates and promissory notes were offered into evidence.  There was no evidence presented at trial that
there was any fraud against Sembera’s wife or that PT had notice that Sembera
lacked authority to sell the shares without his spouse’s joinder.

            The stock purchase agreement was
signed by both Sembera and his wife.  It
specifically states that it is an agreement between PT and its shareholders and
their spouses.  The agreement includes
sections relating to how the shares were to be dealt with in the event of the
death of the shareholder, the death of a spouse, and the termination of a
marriage between the shareholder and spouse. 
Finally, the agreement provided that “such shareholders may sell all or
any portion of his shares and his spouse’s interests, if any.”  This sentence demonstrates PT’s underlying
belief that a shareholder could sell his spouse’s interest.  This same belief is apparent in the “Notice
of Shareholder Election” shown above, which only the shareholder was required
to sign.

            Hendrickson’s and
Norton’s testimony showed that PT believed Sembera’s December 22 email
constituted Sembera’s election to sell his shares.  Hendrickson described it as a “definitive
decision.”  Sembera’s wife was not
required to sign the election form. 
Sembera sent the December 22 email to PT, and it was unnecessary
for Sembera’s wife to participate in that transaction for the email to take on
the legal force of an election.  The
evidence establishes that the trial court erred in entering additional
conclusion of law 7, and we will therefore disregard it. 

            Sembera contends that Norton’s email
of December 14 constituted PT’s making his shareholder election for him.  The election form itself showed December 31,
2001 as the day the shares would be redeemed. 
PT allowed shareholders the period from December 19 through 27 to change
their election form.  The tax ramifications
for PT and each shareholder were a paramount consideration.  Each shareholder had to make an election by
the end of PT’s and each shareholder’s taxable year, which was December
31.  Norton testified that he sent the
December 14 email based on what Sembera had indicated in his December 3
email.  The PT stock purchase agreement
required Sembera to make an election so that the Subchapter S status of PT
would be maintained.  Sembera’s
subsequent emails of January 7 and February 8 showed he believed he had
tendered his shares for redemption by PT on December 31.  The evidence was also legally and factually
sufficient to support the trial court’s findings of facts 13 and 15.  When we disregard the erroneous conclusion of
law, we are left with an implicit finding of fact that Sembera’s December 22
email was an election to sell his shares. 
Further, the evidence was legally and factually sufficient to support
that implied finding of fact.  

            Value of Tendered Shares

            Sembera also attacks the legal and
factual sufficiency of the evidence supporting the following findings of fact
and conclusions of law:

 

Findings of Fact

 

                . . . .

 

19.          The books and records of Petrofac
Tyler, Inc. reflect that effective December 31, 2001, the principal balance
Plaintiff owed on the two promissory notes given for the purchase of his 5,000
shares in Petrofac Tyler, Inc. was $166,700.

 

                . . . .

 

30.          Petrofac Tyler, Inc. did not fail to
comply with any provision of the Stock Purchase Agreement regarding plaintiff
or his wife.

 

                . . . .

 

34.          The net value of the stock purchased
by [P]laintiff and his wife, was $105,269.40.

 

 

                

Conclusions
of Law

 

                . . . . 

 

2.             Petrofac Tyler, Inc. did not breach
the Stock Purchase Agreement dated March 9, 2000 entered into by and among
Petrofac Tyler, Inc. and its shareholders, including Plaintiff.

 

                . . . .         

 

14.          Plaintiff is entitled to receive from
Petrofac Tyler, Inc., in accordance with the Stock Purchase Agreement dated
March 9, 2000, the sum of $105,269.40 which is the net value of his shares of
stock in Petrofac Tyler, Inc.

 

 

                The Stock Purchase
Agreement established the formula for determining the value of Sembera’s
shares.  A letter from the public
accounting firm of Henry & Peters, P.C. of Tyler, Texas dated May 30, 2002
was entered into evidence and contained a detailed calculation, according to
the Stock Purchase Agreement, showing the value of the stock on December 31,
2001.  The letter stated that the value
of each share was $54.39388 and the total value of Sembera’s 5,000 shares was
$271,969.40.  Hendrickson testified from
documents in evidence that Sembera owed $166,700.00 on his notes to PT.  Thus, PT owed Sembera $105,269.40 for his
shares on December 31, 2001.

            Sembera did not produce any evidence
to rebut these figures.  Rather, he
emphasized that he was  a dissenting
shareholder under the Texas Business Corporation Act and therefore entitled to
restoration of his 5,000 PT shares.  The
trial court made a specific finding that Sembera was not a dissenter under the
Texas Business Corporation Act, which has not been attacked on appeal by
Sembera.    

            The Stock Purchase Agreement is part
of the evidence before us.  Sembera has
not attacked its validity.  The trial
court made a finding of fact that Sembera and his wife executed the
agreement.  That finding has not been
attacked on appeal.  PT presented
evidence that it performed its obligations under the agreement.  We hold that there was legally and factually
sufficient evidence to support findings of fact 19, 30, and 34 and conclusions
of law 2 and 14.

PL is not PT’s
Successor

            Sembera attacks finding of fact 31
and conclusions of law 24 and 25, which state:

 

Findings
of Fact

 

                . . . .

 

                31.          Petrofac Limited was not the successor
in interest to Petrofac Tyler, Inc.

                

                . . . .

 

Conclusions
of Law

 

                . . . .

 

                24.          Under the terms of the Sale and
Purchase Agreement dated January 13, 2002, Petrofac Limited was obligated to
issue shares to Petrofac Tyler, Inc. and not to any Petrofac Tyler, Inc.
shareholder; Petrofac Tyler, Inc. had the authority to determine how to
distribute the Petrofac Limited shares, and Petrofac Limited had no role or
involvement in the distribution process.

 

                25.          Petrofac Tyler, Inc. fulfilled its
obligations to its shareholders following the sale of assets to Petrofac
Limited on January 13, 2002.

 

 

                PL in its cross issue
contends the trial court erred when it included PL in Sembera’s judgment for
$105,269.40.  Because these issues
involve the same facts and legal issues, we will consider them together.  Unobjected to evidence established that PL
was a company incorporated in the Isle of Jersey on January 10, 2002.  On January 13, PT sold substantially all of
its assets to PL in exchange for cash and shares of PL stock.  However, PT continued its existence as a
Subchapter S corporation and maintained that status at the time of trial.  The evidence therefore supports the trial
court’s finding that PL was not a successor to PT.  Because of this finding, there is no
connection between Sembera and PL that would support a judgment against PL.  Findings of fact form the basis of a
judgment.  Tex. R. Civ. P. 299. 
As shown above, only the dealings between Sembera and PT are properly
before us.  We overrule Sembera’s third
issue and sustain PL’s cross issue. 
Because we have sustained PL’s cross issue, we need not consider PL’s
three conditional cross issues.

 

Termination of Employment

            In his second issue, Sembera
contends that PL’s termination of his employment on June 10, 2002 could not
have forced him to sell his 5,000 shares in PT. 
We have shown above that Sembera’s shares were tendered to PT on
December 31, 2001 and he ceased to own shares in PT on that date.  Therefore, we overrule Sembera’s second
issue.

 

Prejudgment and Postjudgment Interest

            In his fourth issue, Sembera
contends that he is entitled to prejudgment and postjudgment interest on the
judgment of $105,269.40.  PT contends it
made an offer of this amount to settle the dispute in both February and May of
2002.  It thus contends that Sembera was not
a prevailing party entitled to prejudgment interest because he refused this
amount.  

            A party must prevail before it is
entitled to prejudgment interest. Cf. Apache Corp. v. Dynergy Midstream Servs., L.P., 214 S.W.3d 554, 566
(Tex. App.–Houston [14th Dist.] 2006, no pet.). 
If judgment for a claimant is equal to or less than the amount of a
settlement offer of the defendant, prejudgment interest does not accrue on the
amount of the judgment during  the period
that the offer may be accepted.  Tex. Fin. Code Ann. § 304.105(a)
(Vernon 2006).  Here, Sembera has not
shown he is entitled to prejudgment interest because the judgment he was
awarded was not more than PT’s settlement offer and the amount offered was
continuously available.  

            With reference to postjudgment
interest, the $105,269.40 was unconditionally tendered into the registry of the
trial court prior to trial.  Postjudgment
interest is not available when the judgment amount has been tendered with the
trial court prior to the entry of judgment. See St. Paul Mercury Ins. Co. v. Billiot, 342 S.W.2d 161, 164
(Tex. App.–Beaumont 1960, writ ref’d.). 
Postjudgment interest is simply compensation for a judgment creditor’s
lost opportunity to invest the money awarded as damages at trial. Miga v. Jensen, 96 S.W.3d 207, 212
(Tex. 2002).  When a judgment creditor
has received an unconditional tender of the money awarded, and may invest it as
he chooses, there is no need for the continuing accrual of postjudgment interest.
Id.  We overrule Sembera’s fourth issue.

 

Conclusion

            Because we have sustained PL’s cross
issue, we reverse Sembera’s judgment
against PL and render judgment that Sembera
take nothing against PL.  Having
overruled Sembera’s four issues, we affirm
the
trial court’s judgment for $105,269.40 against PT.[6]

 

                                                                                                     JAMES T. WORTHEN    

                                                                                                                 Chief Justice

 

 

Opinion delivered March 26, 2008.

Panel consisted of Worthen,
C.J., Griffith, J., and Hoyle, J.

                                                                                                                

(PUBLISH)











[1] Taxation is one of the
most important economic considerations when choosing a business form.  See Robert W. Hamilton, Texas
Practice: Business Organizations § 1.13 (2d ed.).  A major factor among taxation issues is that
of federal income taxation.  See id. §
4.7.  Ordinarily, stockholders in a
corporation are effectively taxed twice, once when the corporation is taxed on
its earnings, and then a second time when dividends are paid to the
stockholders.  See id.  However, when a corporation meets certain
requirements, it can elect to be taxed as a Subchapter S corporation and
therefore avoid the initial federal tax on its earnings.  See id.  Significant requirements for Subchapter S
eligibility are that

 

(1) the corporation must not
have more than one hundred stockholders;

 

(2) all the stockholders must
be individuals, qualified estates or trusts, or certain tax exempt
organizations;

                

(3) no stockholder may be a
nonresident alien; and

 

(4) the corporation must not
have more than one class of stock.

 

See 26 U.S.C.A. § 1361(b)(1)
(West, Westlaw through May 2007 amendments).





[2] Norton testified that
the election was necessary so that PT’s Subchapter S election would not be
revoked by the Internal Revenue Service (“IRS”).  Gregory Hendrickson, chief financial officer,
corporate secretary, and a major shareholder in PT, testified that the failure
of any shareholder to make an election could have jeopardized PT’s Subchapter S
election.  Regarding Sembera’s failure to
make a decision, Hendrickson testified that “if [Sembera] would continue to
have sat on the fence, that would have jeopardized our S [corporation] election
by the creation of a second class of stock.” 
Hendrickson also stated that “we were a Subchapter S Corporation, we
could not have two classes of stock.  Two
classes of stock would have created horrific tax consequences that . . . could
have prevented the reorganization plans.” 
“We had to know [who from] our shareholder base was going into [the new
company] and who did not want to go into [the new company].  We didn’t have three options. We had two
options.   You had to get in, or you had
to get out.”





[3] Where the Code
Construction Act does not conflict with chapter 312, and when it is reasonable
to do so, it may also be appropriate to consider methods set forth within the
Code Construction Act, unless it appears that the legislature has chosen not to
apply those methods to uncodified civil statutes.  See Tex.
Gov’t Code Ann. § 311.025 (Vernon 2005) (addressing situations of
irreconcilable statutes); cf. Tex.
Gov’t Code Ann. § 311.026 (Vernon 2005) (addressing the interplay
between specific and general statutory provisions).





[4] As we have explained above, chapter 312,
and not the Code Construction Act, governs our review of article 5.13, section
C.  Therefore, where chapter 312 does not
contradict these common law rules of statutory interpretation, and when the
common law rules would otherwise be appropriate for use, they should be
considered.  Where these common law rules
contradict the Code Construction Act, we must disregard the suggestions
contained within the Code Construction Act and follow the common law if that
common law is binding precedent. Cf. In re Doe, 19
S.W.3d 249, 253 (Tex. 2000) (Texas Supreme Court had the power to set forth the
appropriate standard to be applied by lower courts when determining evidentiary
sufficiency).





[5] The
1967 version of the statute is, with minor revisions not pertinent here, the
version before us for interpretation.  Compare Tex.
Bus. Corp. Act Ann. art. 5.13, § C with Act of June 17, 1967,
60th Leg., R.S., ch. 657, 1967 Tex. Gen. Laws 1723-24. 





[6] To the extent any party has raised additional issues not
addressed in this opinion, we do not consider those issues necessary to the
final disposition of this appeal. 
Therefore, we do not address them. 
See Tex. R. App. P. 47.1.